IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

PEP MORETTI,

      Plaintiff,

v.

CITY OF KENOSHA, ERIC T. LARSEN,          Case No. 25-cv-464
in his individual capacity, and
PATRICK D. PATTON, in his individual
capacity,

      Defendants.

---

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMAMRY JUDGMENT**

---

## <u>INTRODUCTION</u>

Police Officer Pep Moretti ("Moretti" or "Plaintiff") was never denied a promotion based on his sexual orientation. Plaintiff went through the Sergeant promotion process twice. In 2021, he finished second on the eligibility list. The one open Sergeant position went to the Detective who finished just ahead of Plaintiff in first place on the eligibility list. Plaintiff went through the process again in 2023 at which time he finished near the bottom of the eligibility list. Because he did not finish in the top five on the 2023 eligibility list, he was not even qualified or eligible for promotion to Sergeant at that time.

Plaintiff's sexual orientation played no role in his failure to be promoted to Sergeant. And during his deposition, Plaintiff admitted the selection process applied equally to all applicants and was not biased against him based on his sexual orientation. Furthermore, Plaintiff identified several openly gay members of the Kenosha Police Department who <u>had</u> been promoted over the

1

past few years.  Plaintiff was unable to explain how their being openly gay did nothing to hinder their promotion opportunities, while his being openly gay somehow hindered his.

Plaintiff's retaliation claim fairs no better.  Plaintiff claims the City retaliated against him after he filed his August 9, 2023, ERD Discrimination Complaint ("ERD Complaint") by reducing his hours and assignments as a Field Training Officer ("FTO").  However, the record reflects that in 2023, Plaintiff had the fourth highest FTO overtime hours.  In 2024, the year after filing of the ERD Complaint, Plaintiff had the highest number of FTO overtime hours in the entire Department, by a decent margin. The undisputable numbers certainly do not support Plaintiff's claims.

Plaintiff asserts further retaliation in the form of denial of participation in two specialty team assignments – the SWAT Equipment Operator and the Axon Body Camera Instructor positions.  Of course, Plaintiff fails to mention, during that same time period, he was selected for positions on the Major Crash Assistance Team ("MCAT") (a highly specialized position which required the Department to pay for and send Plaintiff to training conducted by Northwestern University) and the Drone Equipment Operator. Selection to two of the four positions applied for undercuts any credibility to Plaintiff's claims of retaliation based on specialty team assignments.

Finally, Plaintiff claims retaliation in the form of "failing to provide him requested back-up in a potentially dangerous situation." This "potentially dangerous" situation involved a bipolar individual who was handcuffed to a hospital bed and heavily medicated. Plaintiff's own police report shows the individual exhibited no signs of violence and required no backup. Instead, Plaintiff was merely waiting for a second officer to arrive to assist in transporting the individual.

Plaintiff's claims have no merit. Plaintiff's counsel went on an extraordinary fishing expedition desperately hoping to find some evidence to support Plaintiff's claims. After several

2

sets of interrogatories, dozens of sets of requests for production, and multiple discovery motions, no such evidence was found.

Plaintiff's claims have no merit. There are no material facts in dispute. And Defendants are entitled to summary judgment in their favor, dismissing Plaintiff's claims in their entirety.

## STATEMENT OF FACTS

The undisputed facts material to Defendants' summary judgment motion are set forth in full in Defendants' Joint Proposed Findings of Fact (hereinafter cited as "Defs. PFOF ¶ _"). Key facts are summarized below for the Court's convenience.

## LEGAL STANDARD

The "purpose of summary judgment is to isolate and dispose of claims" that lack factual support. *Randall v. Rolls-Royce Corp.*, 742 F.Supp. 2d 974, 980 (S.D. Ind. 2010) (citations omitted). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

All questions of fact must be viewed in the light most favorable to the non-moving party; however, this favor does "not extend to drawing inferences that are supported by only speculation or conjecture." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (internal quotations and citations omitted). "A genuine issue of material fact exists only where there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party." *Collins v. Am. Red Cross,* 715 F.3d 994, 997 (7th Cir. 2013) (citing *Harper v. C.R. England, Inc.,* 687 F.3d 297, 306 (7th Cir.2012)). "The mere existence of a factual dispute, by itself. . . is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment." *Randall,* 742 F. Supp. 2d at 981 (citing

*Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Irrelevant or unnecessary facts do not defeat summary judgment, even when in dispute." *Id.* (citation omitted).

"In the employment discrimination context, summary judgment is warranted where 'the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer had discriminated against the plaintiff.'" *Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002) (citing *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1570 (7th Cir.1989)).

## ARGUMENT

### I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S TITLE VII AND §1983 SEX DISCRIMINATION CLAIMS (COUNTS I, III, IV).

Under Title VII, it is unlawful for an employer to discriminate against an employee because of his sex. *See* 42 U.S.C. §2000e-2.[1] And, in assessing summary judgment in an employment discrimination case, it is well-settled the applicable standard is "whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's … sex … or other proscribed factor … caused the adverse employment action." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016); *David v. Bd. of Trustees of Comm. College Dist. No.* 508, 846 F.3d 216, 224 (7th Cir. 2017). In other words, the protected class must be the "'but-for' cause of the challenged adverse employment action." *Brooks v. Avancez,* 39 F.4th 424, 440 (7th Cir. 2022). Ultimately, considering the evidence as a whole, the court conducts a "straightforward inquiry: Does the record contain

---

[1] Courts employ the same liability standards and analysis in evaluating an Equal Protection Claim brought under 42 U.S.C. § 1983. *Burks v. Wisc. Dep't Transp.,* 464 F.3d 744, 751, n. 2 (7th Cir. 2006). Generally speaking, section 1983 claims "follows the contours of Title VII claims." *King v. Board of Regents of University of Wisconsin System,* 898 F.2d 533, 537 (7th Cir. 1990). There is one critical distinction between section 1983 and Title VII claims: "A person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." *Herro v. City of Milwaukee,* 44 F.3d 550, 552 (7th Cir. 1995) (internal quotation omitted); *see also King,* 898 F.2d 537; *Baumgardner v. County of Cook,* 108 F.Supp.2d 1041, 1053 (N.D. Ill. 2000) ("The core of any equal protection right is protection against intentional discrimination.") (citation omitted).

sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018).

While the Seventh Circuit in *Ortiz* simplified the standard to be applied when considering a summary judgment motion on a claim of discrimination, removing the need to duel direct and indirect legal standards, it did not do away with the traditional burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Instead, it remains a useful framework for organizing and assessing evidence in an employment discrimination case. *Ferrill v. Oak Creek-Franklin Join Sch. Dis.*, 860 F.3d 494, 499 (7th Cir. 2017).

As a result, to establish a failure to promote claim, Plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the position he sought; (3) he was rejected; and (4) Defendants filled the position with someone outside the protected class who was not better qualified. *See McCurry v. Kenco Logistics Servs., LLC,* 942 F.3d 783, 788-89 (7th Cir. 2019) (citation omitted).

If Plaintiff can make the *prima facie* case (which here he cannot), "the burden shift(s) to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shift back to the plaintiff to submit evidence the employer's explanation is pretextual.'" *Burks v. Wisc. Dep't Transp.,* 464 F3d 744, 750-51 (7th Cir. 2006) (citations omitted). "Pretext" is more than a mere mistake; it "means a lie." *Ferrill,* 860 F.3d at 499. At all times, the burden remains with the Plaintiff to produce sufficient evidence to persuade the Court the Defendants discriminated against him. *Nawrot v. CPC Int'l,* 277 F.3d 896, 904-06 (7th Cir. 2002) (finding a court does not "sit as a super-personnel department that reexamines an entity's business decision and reviews the propriety of the decision").

Here, Plaintiff brings several discrimination claims. [*See generally* Dkt. No. 19]. These claims can be distilled down to two promotion cycles during which Plaintiff alleges he was discriminated against by not being promoted to Sergeant. [*Id.*]. The first promotion cycle began in 2021 (the "2021 Promotion Cycle"). [*Id.*, at ¶¶19-39]. The second promotion cycle was announced on January 7, 2023 (the "2023 Promotion Cycle"). [*Id.*, at ¶40].

The 2021 and 2023 Promotion Cycles were governed by Kenosha Police Department Policy 34.1 (later revised and renumber as Kenosha Police Department Policy 200.22) (collectively "Promotion Policy"). [Defs. PFOF ¶¶ 26-27].

Pursuant to the Promotion Policy, the Chief of Police has sole and exclusive authority and responsibility for the promotional process within the Kenosha Police Department (the "Department" or "KPD"). [Defs. PFOF ¶ 28]. This authority includes "formulation of the promotional process," which is prescribed as ranking candidates based on the aggregate score of an oral interview, and in-house assessment, seniority, and education. [Defs. PFOF ¶¶ 28-30]. Individuals interested in seeking promotion to Detective, Sergeant, and/or Lieutenant may participate in this process. [Defs. PFOF ¶ 29]. As described in more detail below, individuals participating in this process receive points from the in-house assessment, an oral interview by external evaluators, seniority, and education level. These points determine the individual's overall score. [Defs. PFOF ¶¶ 28-32]. All individuals are then placed on an eligibility list for that position and ranked from highest to lowest score. [Defs. PFOF ¶ 31].

When making a promotion to Detective, Sergeant, and/or Lieutenant, the Chief may make selections from any of the top five scoring candidates on the eligibility list for said positions. [Defs. PFOF ¶ 32]. If a candidate is not in the top five on the eligibility list when a promotion is being made, he/she cannot be selected for that promotion. [Defs. PFOF ¶33]. As individuals are selected

6

for promotion from the eligibility list, all remaining individuals on the eligibility list move up one position. [Defs. PFOF ¶ 34]. By way of example, if #1 on the list is selected for promotion to Sergeant, everyone moves up one position on the eligibility list such that #6 moves into the #5 position and becomes eligible for selection for the next promotion.

The eligibility lists generally remain in place for around 18 months, at which time a new eligibility list is created. [Defs. PFOF ¶ 35]. However, because the Chief has sole and exclusive authority and responsibility for the promotion process, the Chief may shorten or extend the duration of any eligibility list. [Defs. PFOF ¶ 36]. In addition, when it comes time to create a new eligibility list, the Chief has the authority to determine the criteria to be used to award points to individuals to determine eligibility scores. [Defs. PFOF ¶ 37].

A.      **Plaintiff Cannot Establish A *Prima Facie* Discrimination Claim As To The 2021 Promotion Cycle.**

Plaintiff cannot establish a *prima facie* case of discrimination regarding the 2021 Promotion Cycle because he cannot show the City promoted over him a less-qualified candidate outside his protected class.

1.      ***Only one promotion to Sergeant was made from the 2021 Eligibility List and it went to the highest-ranking candidate.***

The 2021 Promotion Cycle began on September 1, 2021. [Defs. PFOF ¶ 38]. As described above, the first step in the process is the creation of a promotion eligibility list. Chief Larsen implemented the process, which consisted of an internal evaluation, oral interview, seniority points, and education points. [*Id.*]. The internal evaluation was completed by individuals within the KPD who had supervisory authority over the candidate. [Defs. PFOF ¶ 39]. The internal evaluation accounted for 55% of the individual's total score. [Defs. PFOF ¶ 40].

The oral interview was conducted by a panel of three independent individuals from law enforcement agencies around the state of Wisconsin. [Defs. PFOF ¶ 41]. The oral interview accounted for 45% of the individual's total score. [Defs. PFOF ¶ 42].

Candidates also received additional raw points added to the total score based on seniority and education level. [Defs. PFOF ¶ 43]. Seniority points ranged from 2.5 to 8.0 points based on years of service with the KPD, and education points ranged from 1.0 to 3.0 points based on college credits. [*Id.*].

After all scores were calculated, Detective Benjamin Antaramian[2] ranked first on the Sergeant eligibility list with an aggregate score of 103.24. [Defs. PFOF ¶¶ 45-47]. Plaintiff ranked second with an aggregate score of 100.97. [Defs. PFOF ¶ 45].

The City made only one promotion to Sergeant from the 2021 Promotion Cycle. [Defs. PFOF ¶¶ 46-48]. Detective Antaramian was promoted to Sergeant on January 1, 2022. [*Id.*]. Detective Antaramian had a higher score than Plaintiff and was ranked #1 on the eligibility list. [Defs. PFOF ¶¶ 45-47]. Because of this, Plaintiff cannot show a less qualified straight individual was selected for the Sergeant position over him. The City did not select a less-qualified candidate over Plaintiff; it selected the highest-ranked candidate for the only promotion considered. [Defs. PFOF ¶¶ 45-48].

Because Plaintiff cannot establish he was denied promotion in favor of a similarly situated individual outside his protected class who was less qualified, his discrimination claim arising from the 2021 Promotion Cycle fails to establish a *prima facie* claim.

---

[2] It bears noting, at the time, Detective Antaramian held the rank of Detective, while Officer Moretti held the rank of Police Officer. Thus, Detective Antaramian was already in a higher position than Moretti at the time of selection for the Sergeant position. [Defs. PFOF ¶ 44].

## 2. *Due to patrol officer staffing shortages, no additional Sergeant promotions were made from the 2021 eligibility list.*

As stated in Section I(A)(1), *supra*, no additional Sergeant promotions were made from the 2021 eligibility list. In his Complaint, Plaintiff points to a sergeant vacancy due to a retirement in July of 2022 and claims the position was left vacant because of Plaintiff's sexual orientation. [Dkt. #19, ¶¶32-37]. Of course, Plaintiff admitted during his deposition he has no evidence to support this assertion, and none exists because the position was left open due to a shortage of patrol officers.

Plaintiff did move to the top position on the Sergeant eligibility list after Detective Antaramian's promotion. [Defs. PFOF ¶ 47]. However, the City's personnel and staffing needs prevented <u>any</u> additional Sergeant promotions during the 2021 Promotion Cycle. [Defs. PFOF ¶¶ 49-64]. After Detective Antaramian was promoted, the KPD was carrying seven supervisors on third shift, which is one more than KPD historically carried for that shift. [Defs. PFOF ¶ 49]. And, KPD was carrying this additional sergeant at a time when it was short staffed on patrol officers. [Defs. PFOF ¶¶ 49-64].

In July of 2022, Sergeant Vincent Lang retired. [Defs. PFOF ¶ 50]. This brought the number of supervisors on second shift back down to six, which is the normal number of supervisors allocated to a shift at KPD when fully staffed. [Defs. PFOF ¶ 51]. However, the KPD was still short staffed on patrol officers. [Defs. PFOF ¶ 51].

Chief Larsen was scheduled to retire at the end of December 2022. [Defs. PFOF ¶ 53]. From July 2022 to December 2022, Chief Larsen did not make <u>any</u> additional Sergeant promotions because the Department was experiencing a shortage of patrol officers and could not afford to lose additional patrol staffing by promoting officers into supervisory positions. [Defs. PFOF ¶ 54]. In

9

addition, because of the lower than normal number of patrol officers, there was no need for additional supervisory positions. [Defs. PFOF ¶¶ 51-55].

During his deposition, Chief Larsen testified he never even considered making a promotion to Sergeant from July 2022 to December 2022, and that decision had nothing to do with who was on the eligibility list at the time. [Defs. PFOF ¶ 55]. The City's personnel rosters confirm these staffing concerns, showing open patrol positions remained throughout the remainder of the 2021 Promotion Cycle. [Defs. PFOF ¶ 56].

### 3. In January of 2023, Patrick Patton became Chief of Police and began implementing new criteria for promotions.

Following Chief Larsen's retirement, Patrick Patton became Chief of Police on January 1, 2023. [Defs. PFOF ¶ 57]. Chief Patton inherited the 2021 promotion eligibility list from Chief Larson. [Defs. PFOF ¶¶ 58-63]. While Chief Patton had the authority under the Promotion Policy to create a new eligibility list, he chose to continue the 2021 eligibility list through June 30, 2023. [Defs. PFOF ¶ 64]. At the time, the aforementioned patrol officer shortages continued, which was going to shelve any Sergeant promotions for at least the first part of the year. [Defs. PFOF ¶ 65].

Chief Patton entered the position as Chief of Police during the aftermath of the 2020 Kenosha unrest. [Defs. PFOF ¶ 58]. In conjunction with community outreach, Chief Patton took the position with specific goals and initiatives for the Department, including placing greater emphasis on education and objectivity within the promotional process for Detecting, Sergeant and Lieutenant. [Defs. PFOF ¶¶ 59-62].

As part of implementing those initiatives, Chief Patton revised the process for future Detective, Sergeant, and Lieutenant positions. [Defs. PFOF ¶¶ 67-74]. In an effort to increase objectivity, Chief Patton revised the point process for the internal evaluations and external oral interviews. [Defs. PFOF ¶ 67]. While previously the internal evaluations counted for 55% of the

score and the external oral interviews for 45% of the score, now each would count for 50% of the score. [*Id.*]. Because of the increased focus on education, education points were increased from 1-3 points to 2-4 points. [Defs. PFOF ¶ 68]. In addition, under the former system, having the bare minimum of 60 college credits earned a candidate 1 education point. [Defs. PFOF ¶ 70]. However, under the new system a candidate received zero education points unless he/she had at least a bachelor's degree, which earned the candidate 2 education points. [*Id.*].

Because of the ongoing patrol officer shortages, and Chief Patton's new vision for the Department, Chief Patton chose not to make <u>any</u> additional Sergeant promotions from the 2021 Promotion Cycle before it expired on June 30, 2023. [Defs. PFOF ¶ 71]. Chief Patton testified his decision to move forward with a new promotional process was unrelated to the identity of any individual on the existing eligibility list. [Defs. PFOF ¶¶ 72-73]. The decision was based on Department-wide goals regarding staffing, objectivity, and the qualifications expected of future supervisors. [Defs. PFOF ¶ 74].

These staffing concerns and the desire to implement his vision, including emphasis on higher education and objective evaluation criteria, constitute legitimate, nondiscriminatory reasons for the City's decisions regarding the 2021 Promotion Cycle. Plaintiff cannot establish this was mere pretext because there is no evidence the City's reasons were false or a cover for discrimination. In fact, Plaintiff could have scored well in the new process and been eligible for promotion under the new eligibility list. [Defs. PFOF ¶¶ 79-90]. Plaintiff had the same opportunity as every other candidate to compete for a position on a 2023 eligibility list. [Defs. PFOF ¶ 81]. And Plaintiff admitted during his deposition that the new promotion process was equal for everyone and was not biased against him due to his sexual orientation. [*Id.*].

Accordingly, Plaintiff cannot establish a prima facie discrimination claim, and Defendants have articulated legitimate, nondiscriminatory reasons for the City's decisions regarding the 2021 Promotion Cycle. Plaintiff cannot show those reasons were pretextual.

**B.     Plaintiff Cannot Establish A *Prima Facie* Discrimination Claim As To The 2023 Promotion Cycle.**

The 2023 Promotion Cycle began with the creation of the 2023 promotion eligibility list. [Defs. PFOF ¶ 67]. Plaintiff participated in the promotion process and received a score of 82.81 points, which ranked him nearly at the bottom of the 2023 promotion eligibility list. [Defs. PFOF ¶ 79].

Unlike the 2021 Promotional Cycle, Plaintiff cannot even establish he was qualified for promotion to Sergeant during the 2023 Promotional Cycle because he did not rank among the top five candidates on the eligibility list. [Defs. PFOF ¶ 80]. Under the City's Promotion Policy, only candidates placing within the top five are eligible for promotion. [Defs. PFOF ¶ 84]. Because Plaintiff did not meet this requirement, he was not eligible for promotion to Sergeant during the 2023 Promotion Cycle. [Defs. PFOF ¶ 85].

Accordingly, Plaintiff cannot establish a *prima facie* case of discrimination. The City did not select a less-qualified candidate over Plaintiff. Instead, any Sergeant promotions made from the 2023 Promotion Cycle necessarily went to candidates who scored higher than Plaintiff and ranked above him on the eligibility list. [Defs. PFOF ¶ 86].

The City's decision to follow its Promotion Policy and promote only candidates eligible under the established process is a legitimate, nondiscriminatory, and non-pretextual reason for Plaintiff's non-selection. The Promotion Policy applies equally to all candidates and does not consider an applicant's sexual orientation. [Defs. PFOF ¶ 87]. In addition, Plaintiff cannot establish the Promotion Policy discriminates against openly gay officers when the undisputed evidence

12

shows openly gay officers have successfully advanced through the same promotional process. [Defs. PFOF ¶¶ 10-17].

For example, Lieutenant Desiree Farchione is openly gay and has successfully promoted through the Department's ranks from Officer to Sergeant and from Sergeant to Lieutenant. [Defs. PFOF ¶ 11]. Similarly, Sergeant James Rockweiler is openly gay and has been promoted within the Department, first from Officer to Detective on October 1, 2024, and later from Detective to Sergeant on January 1, 2026. [Defs. PFOF ¶ 12].

The promotion of openly gay officers directly contradicts Plaintiff's claim the City's promotional process prevents openly gay employees from advancing to Sergeant. Plaintiff cannot establish the City's Promotion Policy was discriminatory or the City's reliance on the policy was a pretext for discrimination.

Because Plaintiff cannot establish a prima facie case of discrimination and cannot show the City's legitimate reasons for its promotional decisions were pretextual, Defendants are entitled to summary judgment on Plaintiff's failure-to-promote claims arising from the 2021 Promotion Cycle and 2023 Promotion Cycle.

II.     **DEFENDANT CITY OF KENOSHA IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S TITLE VII RETALIATION CLAIM (COUNT II).**

Plaintiff's Title VII retaliation claim against the City is nothing more than pure speculation and conjecture from a disgruntled employee. Plaintiff cannot identify any direct, indirect, or even circumstantial evidence giving rise to a reasonable inference the City took any materially adverse action against him <u>because</u> he engaged in protected activity.

Like the standard for a Title VII discrimination claim, for a Title VII retaliation claim, it is well-settled the applicable standard is "whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's" protected activity "caused the ... adverse employment action."

*Ortiz,* 834 F.3d at 765; *David*, 846 F.3d at 224. In other words, the protected activity must be the "'but-for' cause of the challenged adverse employment action." *Brooks,* 39 F.4th, at 440. Ultimately, considering the evidence as a whole, the Court conducts a "straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?" *Abrego*, 907 F.3d at 1014.

A plaintiff may use direct or circumstantial evidence to establish the employer took an adverse action <u>because of</u> a protected activity. Alternatively, a plaintiff may still use the *McDonnell-Douglas* burden shifting framework. *See Skiba v. Ill. Cent. R.R. Co.,* 884 F.3d 708, 719 (7th Cir. 2018); *Ortiz,* 834 F.3d at 761.

Here, there is no direct evidence of any retaliation by the City, such as admissions by Captain Dillhoff, Sergeant Brennan, or others. As a result, Plaintiff must proceed using indirect and circumstantial evidence to establish but for causation. As with Plaintiff's discrimination claim discussed above, Plaintiff may use the *McDonnell Douglas* burden shifting framework, which requires Plaintiff to proffer a *prima facie* case. To establish Title VII retaliation *prima facie* case, Plaintiff must demonstrate: (1) he engaged in a protected activity; (2) he suffered a materially adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.

A "materially adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68 (2006) (citations omitted). And to establish a "but for" causal connection between the material adverse action and protected activity there must be evidence that "the adverse action would not have happened" had he not engaged in his protected activity. *Adebiyi v. S. Suburban College*, 98 F.4th 886, 892 (7th Cir. 2024) (citations omitted).

14

Regardless of whether Plaintiff proceeds outside of or together with the burden-shifting framework, he usually must produce "circumstantial evidence." Circumstantial evidence may include: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically received better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. *Rowlands v. United Parcel Serv.-Fort Wayne,* 901 F.3d 792, 802 (7th Cir. 2018) (internal quotations and citations omitted).

However the Court evaluates Plaintiff's retaliation claim, he lacks evidence sufficient for a factfinder to find a "but for" connection between the 2023 ERD Complaint and the City's alleged retaliatory actions in 2025.

Plaintiff asserts a litany of alleged retaliatory acts in Paragraph 73 of his Complaint:

Since Moretti filed a Discrimination Complaint with the ERD on August 9, 2023, the City of Kenosha has taken adverse actions against Moretti, including not assigning him recruits as a Field Training Officer, not allowing him to train recruits for other FTOs when those FTOs are absent from work, removing him as the FTO for recruits already assigned to him, not selecting him to train and instruct new recruits from the police academy during the recruits' onboarding process, not selecting him for the equipment operator position on the SWAT team, not selecting him to be an Axon body camera instructor, and failing to provide him requested back-up in a potentially dangerous situation. [Dkt. No. 19, ¶73].

The claim, in essence, is the City retaliated against Plaintiff after he filed his discrimination complaint on August 9, 2023, by (1) prohibiting him from continuing his FTO duties in 2025, (2) not selecting him for specialty team assignments in 2025, including the SWAT Team Equipment Operator and Axon Body Camera Instructor position, and (3) intentionally failing to provide back-up to Plaintiff when he was in a potentially dangerous position in 2025. [*See Id*.]. None of Plaintiff's retaliation claims pass muster.

**A.** **Plaintiff Cannot Establish A "But For" Causal Connection Between His 2023 ERD Complaint And The City's FTO Assignment Decisions.**

Becoming an FTO with the City requires successful completion of the City's FTO training program. [Defs. PFOF ¶ 96]. After completing the training, an officer is placed into the FTO Cadre and becomes eligible to train recruits. [Defs. PFOF ¶¶ 97-98]. The FTO Cadre exists to assist newer officers by <u>evaluating</u> and <u>documenting</u> their performance, identifying areas for improvement, and helping recruits develop the necessary skills and techniques to become successful officers. [Defs. PFOF ¶ 101].

At any given time, the FTO Cadre may consist of 40 to 60 officers. [Defs. PFOF ¶ 102]. The Training Division manages the FTO Cadre, with oversight from the Captain and Sergeant assigned to the Division. [Defs. PFOF ¶¶ 103-104]. When making FTO assignments, the Training Division considers the needs of the department, the experience level of individual FTOs, the number of available recruits, and other operational factors. [Defs. PFOF ¶ 105]. There is no formula, requirement, or policy guaranteeing each FTO receives a specific number of training hours or recruits each year. [Defs. PFOF ¶ 106]. FTO assignments vary significantly among the Cadre, and it is not uncommon for an FTO to receive little to no training hours in a given year. [Defs. PFOF ¶¶ 106-118].

Despite the flexible nature of the FTO program, Plaintiff claims the City retaliated against him for filing his ERD Complaint by reducing his FTO assignments and hours. [Defs. PFOF ¶¶ 91-95]. Plaintiff's claim is based entirely on speculation and lacks any support in the record.

Plaintiff filed his ERD discrimination complaint on August 9, 2023. [Defs. PFOF ¶ 91]. In 2023, the top five FTOs for overtime hours were as follows:

1. Officer Daniel Maccari – 80.50 FTO overtime hours
2. Officer Patrick Newell – 76.50 FTO overtime hours
3. Officer Michael Witz – 67.50 FTO overtime hours

>    **4.  *Officer Pep Moretti – 62 FTO overtime hours***
>    5.  Officer Jason Krueger – 59.50 FTO overtime hours

[Defs. PFOF ¶ 107]. Plaintiff (Officer Pep Moretti) was fourth overall with 62 FTO overtime hours for the year.

In 2024, the year <u>after</u> Officer Moretti filed his ERD Complaint, the five most worked FTOs were as follows:

>    **1.  *Officer Pep Moretti – 104 FTO overtime hours***
>    2.  Officer Daniel Stone – 91.50 FTO overtime hours
>    3.  Officer Adam Sawyer – 86 FTO overtime hours
>    4.  Officer Zachary Berry – 84 FTO overtime hours
>    5.  Officer Michael O'Neil – 83.50 FTO overtime hours

[Defs. PFOF ¶¶ 108].

Plaintiff (Officer Pep Moretti) had the highest number of FTO overtime hours in the year <u>following</u> the filing of his ERD complaint. Plaintiff received 12.50 more FTO overtime hours than the next highest FTO in 2024. [*Id.*]. Further, Plaintiff was the <u>only</u> FTO among the top five recipients of FTO overtime hours in <u>both</u> 2023 and 2024. [Defs. PFOF ¶¶ 107-108]. In fact, Plaintiff received the most FTO overtime hours during the two-year period of anyone in the KPD. [Defs. PFOF ¶ 109].

Plaintiff's retaliation theory is eviscerated by the fact the City provided him with the most FTO overtime hours in 2024, <u>after</u> the filing of the ERD Complaint. In addition, Plaintiff had the most FTO overtime hours for the two-year period of 2023-2024. Again, these numbers completely defeat Plaintiff's claim his FTO hours were reduced following the filing of the August 2023 ERD Complaint.

During discovery, Plaintiff realized his retaliation claim had completely fallen apart due to the increase in FTO hours following the filing of the ERD Complaint. Therefore, he shifted the

argument and began claiming he was placed on a "secret suspension" from the FTO Cadre in 2025. Of course, Plaintiff has no evidence to support this assertion.

And to be clear, Plaintiff was never removed or suspended from the 2025 FTO Cadre. [Defs. PFOF ¶¶ 111-116]. Instead, the Training Division provided Plaintiff with a temporary break from training for three legitimate, non-retaliatory reasons: (1) newly certified FTOs needed opportunities to gain experience and were prioritized for recruit assignments; (2) Plaintiff had trained recruits continuously and with the highest number of hours in the Department for two years; and (3) the Training Division had concerns Plaintiff was experiencing "FTO burnout." [Defs. PFOF ¶¶ 111-120].

This was not something new that was put in place specifically for Plaintiff. [Defs. PFOF ¶¶ 117-120]. FTO Cadre duties are taxing, and the Department had recognized FTO burnout with many other members of the FTO Cadre. [*Id.*]. When this occurred, the regular practice was to place the individual on a short break from FTO duties. [Defs. PFOF ¶ 119].

Based on these considerations, Captain Dillhoff and Sergeant Brennan made the operational decision to temporarily reduce Plaintiff's training assignments. [Defs. PFOF ¶¶ 114-115]. They did not remove any recruits from Plaintiff or prevent him from serving as an FTO. [Defs. PFOF ¶ 116]. Rather, they temporarily did not assign Plaintiff a new recruit or assign him as a substitute FTO when another FTO was unavailable. [Defs. PFOF ¶ 121]. The purpose of the decision was to provide Plaintiff with a reset, preserve his effectiveness as an FTO, and address concerns regarding potential burnout. [Defs. PFOF ¶ 122]. Neither Captain Dillhoff nor Sergeant Brennan viewed giving Plaintiff a break from training as punishment or discipline. [Defs. PFOF ¶ 123].

No reasonably jury could find a "but for" casual connection between Plaintiff's 2023 ERD Complaint and the City's 2025 FTO Cadre decisions. Instead, the evidence demonstrates the City's decisions were based on legitimate, non-retaliatory operational and personnel considerations.

Furthermore, this temporary break occurred nearly one and a half years after Plaintiff filed his ERD Complaint. And it happened after a two-year period during which Plaintiff had the highest number of FTO overtime hours in the Department. Nevertheless, Plaintiff alleges the City retaliated against him nearly 18 months after he filed his ERD Complaint. The Seventh Circuit has long recognized the passage of time between protected activity and an adverse action weakens any inference of retaliation, acknowledging "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 918 (7th Cir. 2000) (citation omitted).

"For an employer's actions to be on the close heels of an employee's conduct, thus allowing an inference of causation based on timing alone, [the Seventh Circuit] 'typically allow[s] no more than a few days to elapse.'" *Daza v. Indiana,* 941 F.3d 303, 309 (7th Cir. 2019) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (the protected activity and adverse action must be "very close" in time).

Here, Plaintiff does not allege the City's FTO decisions occurred days, weeks, or even months after his ERD Complaint. Instead, he claims retaliation occurred more than a year later. Such a significant gap requires "additional proof of a causal nexus" beyond timing alone to overcome summary judgment. *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir. 1998); *see also O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011) (finding a two-month gap between protected activity and adverse employment action "not strongly suggestive of retaliation"); *see also Alamo v. Bliss,* 864 F.3d 541, 556 (7th Cir. 2017) (citing that

an "inference of retaliation can be weakened by a lengthy period of time between the protected activity and the alleged retaliation.").

The City's 2025 FTO assignments also demonstrate Plaintiff's ERD Complaint played no role in the Training Division's decisions. In 2025, the City added nine new FTOs. [Defs. PFOF ¶ 110]. As newly certified FTOs, these officers needed opportunities to gain experience training recruits. [Defs. PFOF ¶ 110]. Accordingly, the Training Division prioritized providing assignments to newer FTOs, including:

1. Officer Joshua Aquino – 20 FTO overtime hours
2. Officer Kyle Boeck – 6 FTO overtime hours
3. Officer Arguro Burgos-Gutierrez – 73 FTO overtime hours
4. Officer Ulises Flores – 2 FTO overtime hours
5. Officer November Keaskowski – 3 FTO overtime hours
6. Officer Anthony Kowalski - 6 FTO overtime hours
7. Officer Justin Labatore – 80.50 FTO overtime hours
8. Officer Charles Lyons – 7 FTO overtime hours
9. Officer Eric Shupryt – 67 FTO overtime hours

With the influx of new FTOs, the Training Division sought to provide less experienced FTOs with meaningful training opportunities. [Defs. PFOF ¶ 110]. No member of the 2025 FTO Cadre received more than 86 total FTO overtime hours (as a reminder, Plaintiff had 104 FTO overtime hours in 2024). [Defs. PFOF ¶ 110]. FTO assignments are inherently limited, and providing additional training opportunities to newer FTOs necessarily results in fewer assignments for other FTOs. [Defs. PFOF ¶¶ 105-110].

In addition to Plaintiff serving as one of the Department's most frequently used FTOs in prior years and newer FTOs needing opportunities to gain experience, Defendants also had legitimate concerns about Plaintiff experiencing "FTO burnout." One of Plaintiff's final recruits in 2024, Officer Jarrett Ramer, expressed concerns about Plaintiff's attitude during training. [Defs. PFOF ¶ 111]. Officer Ramer testified Plaintiff maintained a negative attitude toward KPD

20

throughout the training process, which he believed was inappropriate. [Defs. PFOF ¶¶ 111-113]. Officer Ramer also testified he reported those concerns to Sergeant Brennan because he believed Plaintiff's attitude could negatively influence future recruits. [Defs. PFOF ¶ 113].

Sergeant Brennan and Captain Dillhoff, based on their experience working with FTOs, knew frustrations may be a sign of "FTO burnout," so the standard practice was to give that FTO a break from training. [Defs. PFOF ¶ 114].

The City's FTO decisions in 2025 would have occurred regardless of Plaintiff's ERD Complaint. Even absent Plaintiff's protected activity, the Training Division still would have prioritized giving newly certified FTOs experience in 2025. They still would have been concerned about Plaintiff's number of training hours. And, similarly, Officer Ramer's concerns regarding Plaintiff's interactions with recruits and Plaintiff's potential FTO burnout would have existed regardless of Plaintiff's ERD Complaint. Those concerns arose from Plaintiff's workload and conduct as an FTO, not from any retaliatory motive.

As a result, looking at evidence surrounding the City's FTO assignments, there is no "but for" causal link between Plaintiff's 2023 ERD Complaint and the City's actions. And there is no evidence to support the City's actions were pretext.

No reasonable jury could find the City's actions were pretext. *See Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 478–79 (7th Cir. 2010) ("To demonstrate pretext, [Plaintiff] must show that [his] employer did not honestly believe in the reasons it gave for its [adverse employment actions]."). "Employers may act for many reasons, good and bad; they may err in evaluating employees' strength; unless they act for a forbidden reason, these errors (more properly, differences in assessment) do not matter." *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) (citations omitted). Pretext will not be found where the decision-maker holds an honest

21

belief for the reason it offers. *Liu v. Cook Cty.*, 817 F.3d 307, 316 (7th Cir. 2016). To be sure, "courts 'do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions.'" *Crotteau v. St. Coletta of Wis.*, 200 F. Supp. 3d 804, 814 (W.D. Wis. 2016) (quoting *Ajayi v. Aramark Bus. Servs.*, 336 F. 3d 520, 532 (7th Cir. 2003)).

In the end, there is no casual connection between Plaintiff's ERD Complaint and the City's FTO Cadre decisions. The City's actions are all supported by legitimate, non-retaliatory reasons, all of which are not pretext. Consequently, Plaintiff's Title VII Retaliation Claim against the City for its actions with respect to Plaintiff's FTO assignments fails.

**B. Plaintiff Cannot Establish A "But For" Causal Connection Between His 2023 ERD Complaint And His Failure To Receive Specialty Team Assignments in 2025.**

Plaintiff claims further retaliation for filing the 2023 ERD Complaint was in the form of the Department not selecting him for specialty teams; namely, the SWAT team equipment operator position and the Axon body camera instructor. [Defs. PFOF ¶ 124]. Of course, Plaintiff neglects to mention he applied for four separate positions and was selected for two of them. [Defs. PFOF ¶¶ 134-137].

Plaintiff was selected for the Major Crash Assistance Team (MCAT) on January 8, 2025. [Defs. PFOF ¶¶ 134-135]. This is a highly specialized position which required the Department to pay for and send Plaintiff to training conducted by Northwestern University. [Defs. PFOF ¶ 136]. In addition, Plaintiff was selected as a Drone Equipment Operator on April 14, 2025. [Defs. PFOF ¶ 137]. Similarly, this is a highly skilled position, which required time and resources committed by the Department. Selection to two of the four positions applied for undercuts any credibility to Plaintiff's claims of discrimination and/or retaliation.

22

Apparently, Plaintiff's specialty team claim rests on the assumption he is entitled to <u>every</u> specialty team assignment for which he applies. The City's decision not to select Plaintiff for every specialty assignment does not support an inference of retaliation. Yet, Plaintiff asks the Court to reach precisely this conclusion. The facts do not support Plaintiff's claims. And the City had legitimate, non-discriminatory reasons for not selecting Plaintiff for the two positions mentioned in his Complaint.

On August 24, 2024, the City had two SWAT Equipment Operator positions available. [Defs. PFOF ¶ 125]. Plaintiff applied for one of the positions but was not selected. [*Id.*]. Plaintiff also applied for the Axon Body Camera Instructor position in 2025 but was not selected. [Defs. PFOF ¶¶ 130-133].

Captain Dillhoff was responsible for selecting candidates for both positions. [Defs. PFOF ¶¶ 125-133]. As part of the selection process, Captain Dillhoff reviewed the applicants and conducted interviews with an interview panel. [*Id.*]. Captain Dillhoff testified that during the selection process, he sought to provide newer officers with opportunities to become more involved in the operational side of the Department. [Defs. PFOF ¶ 128, 131]. He also wanted to provide opportunities for officers who had less operational involvement to gain additional experience. [*Id.*].

For the Axon Body Camera Instructor position, Captain Dillhoff also considered the Department's transition to a new body camera system. [Defs. PFOF ¶ 131]. Specifically, he wanted instructors who could learn and teach the Axon system without relying on experience from the prior system. [*Id.*]. As a result, he sought candidates without prior instructor experience on the former body camera platform. [*Id.*].

Plaintiff did not align with the criteria Captain Dillhoff considered when making these selections. [Defs. PFOF ¶ 133]. Plaintiff was already heavily involved in the operational side of

the Department. [Defs. PFOF ¶ 131]. As discussed above, Plaintiff was one of the most utilized FTOs and regularly received significant training assignments. [Defs. PFOF ¶ 129]. Accordingly, selecting another officer for the SWAT Team Equipment Operator position provided an opportunity for someone with less operational experience to become involved in these areas.

Additionally, Plaintiff previously served as an instructor for the Department's former body camera system, making him less suited for the Axon Instructor position based on the Department's goal of bringing in instructors without prior system-specific training. [Defs. PFOF ¶¶ 132-133].

Applying the same standard discussed in Section II(A) above, Plaintiff cannot establish a "but for" causal connection between his 2023 ERD Complaint and the City's decisions regarding the SWAT Equipment Operator and Axon Body Camera Instructor positions in 2025.

First, the timing of Plaintiff's alleged retaliation does not support an inference of retaliatory motive. Plaintiff alleges the City retaliated against him more than one year after he filed his ERD Complaint. Again, a significant gap between protected activity and an alleged adverse action weakens any inference of causation and requires additional evidence connecting the two events. Plaintiff offers no such evidence.

Second, the City's reasons for not selecting Plaintiff were legitimate, non-retaliatory reasons based on personnel considerations and operational needs. Plaintiff cannot establish retaliation merely because he disagrees with the City's discretionary selection decisions. And this Court does not sit as a personnel department, second-guessing an KPD's facially legitimate business decision.

Most importantly, Plaintiff's own employment history during the same timeframe contradicts his entire retaliation theory. After filing his ERD Complaint, Plaintiff was selected for two other specialty teams requiring significant training and time commitments. [Defs. PFOF ¶¶

24

134-137]. Specifically, Plaintiff was selected as a Drone Equipment Operator on April 14, 2025, and selected for the Major Crash Assistance Team (MCAT) on January 8, 2025. [*Id.*].

It defies logic to conclude the City retaliated against Plaintiff by denying him two specialty team assignments while simultaneously selecting him for two other specialty teams during the same period. The City's actions demonstrate the opposite of retaliation: Plaintiff continued to receive opportunities for specialized assignments even after filing his ERD Complaint. This is undisputed.

Accordingly, Plaintiff cannot, under any circumstances, establish a "but-for" causal connection between his 2023 ERD Complaint and the City's decisions regarding specialty team assignments. No reasonable jury could conclude the City retaliated against Plaintiff by selecting other candidates for the SWAT Equipment Operator and Axon Body Camera Instructor positions while selecting Plaintiff for the Drone Equipment Operator and MCAT positions.

    **C.    Plaintiff Did Not Suffer A Materially Adverse Action When He Waited To Be Relieved From Duty And He Cannot Establish A Causal Connection Between His 2023 ERD Complaint And The City's Actions.**

Plaintiff's final retaliation theory arises from an incident on March 16, 2025, when he was assigned to guard an individual who was handcuffed to a hospital bed. [Defs. PFOF ¶ 138]. The individual never became violent, threatened Plaintiff, or presented a physical danger during the encounter. [Defs. PFOF ¶ 139]. Plaintiff's own report from the incident does not contain any reference to "backup" or a request for assistance due to a safety concern. [Defs. PFOF ¶¶ 140-142].

In addition, during Plaintiff's deposition, he admitted the individual did not present a physical threat while Plaintiff was guarding him:

25

Q     Yet there were no physical outbursts by Jackson at any point in time during the period you were watching him while he was handcuffed to the hospital bed, correct?

A     Other than being irritated, restless and using profanity without warning, no.

[Cone Decl. ¶ 13, Ex. K, 139:20-25].

Despite the undisputed facts and Plaintiff's own testimony, Plaintiff now claims the City retaliated against him by after filing his ERD Complaint by "failing to provide him requested back-up in a potentially dangerous situation." [Defs. PFOF ¶ 138].

The evidence does not support Plaintiff's characterization of the incident. Plaintiff's report indicates he "requested a second officer from Operations" and contacted Operations "to notify them and OFC Vences 686 responded with transport restraints." After Officer Vences arrived, Plaintiff and Officer Vences transported the individual. Plaintiff's request was not for backup due to a dangerous situation; rather, Plaintiff requested another officer to assist with transporting the individual. The two requests are not the same and are treated drastically differently by the City.

Chief Patton reenforced the distinction during the City's Fed. R. Civ. P. 30(b)(6) deposition, explaining the term "backup" was being misused because law enforcement generally uses the term when an officer faces a safety concern or immediate danger. Here, Plaintiff requested relief or assistance with transportation, not emergency backup:

Q     Now, why was Officer Moretti left to guard a homicidal paranoid schizophrenic at a hospital on or about March 16, 2025, for three hours and 40 minutes despite his numerous requests for backup?

A     Yeah. This is my -- first time was preparing for this to actually learn about that situation, so I learned -- the word "backup" I think is being misused here. There's a difference between backup and relief.

He was guarding an individual that was what we refer to as a Chapter 51, meaning they were going to go to a -- a mental health facility. The individual was handcuffed to a bed and sedated or on some sort of medication.

He had requested relief for -- or a – a second person to help transport that individual to the hospital, but there was no pressing need. When we think

26

> or use the word "backup" in law enforcement, we think it's due to a danger or something like that. This had to do with the transport.
>
> Q    So are you saying that Officer Moretti inappropriately asked for assistance?
>
> A    No. He asked for a second officer to come transport the individual to the hospital, to my understanding, and that oftentimes is going to be put on priority, it's going to get there when it gets there. We have officers that guard people for entire shifts.

[Cone Decl. ¶12, Ex. I, 153:11-154:12].

As a result, the record contains no evidence Plaintiff requested backup, no evidence the City denied a request for backup, and no evidence Plaintiff was placed in a dangerous situation requiring additional officers. Instead, the record establishes Plaintiff requested assistance with transporting an individual, and another officer responded to assist. [Defs. PFOF ¶ 143].

Even assuming Plaintiff could establish a materially adverse action, he cannot establish a causal connection between his 2023 ERD Complaint and the City's response to his request for another officer. The incident occurred more than one year after Plaintiff filed his ERD Complaint, which weighs against any inference of retaliation. Plaintiff offers no evidence connecting the City's alleged actions on March 16, 2025, to his 2023 ERD Complaint. Instead, Plaintiff relies solely on speculation and his own characterization of the incident, neither of which is sufficient to establish retaliation. Plaintiff cannot establish a "but-for" causal connection between his 2023 ERD Complaint and the City's response to his request for another officer on March 16, 2025.

### III.    DEFENDANT CITY OF KENOSHA IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S *MONELL* CLAIM (COUNT V).

Liability under §1983 cannot be imposed on the basis of *respondeat superior. See Monell v. Dep't of Social Servs. Of N.Y.*, 436 U.S. 658, 690-94 (1978). Instead, a municipality is only liable under §1983 when a constitutional violation is caused by a municipal policy, custom or practice. *See Id.* Such liability may be demonstrated in three ways: (1) by an express policy that, when enforced, causes a constitutional deprivation; (2) by a widespread practice that, although not

27

authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) by a showing that the constitutional injury was caused by a person with final policymaking authority. *Baskin v. City of Des Plaines,* 138 F.3d 701, 704-05 (7th Cir. 1998) (citations omitted).

Plaintiff's claim is premised entirely on "defendants Larsen and Patton were final policy-makers and final decision-makers for defendant City of Kenosha with regard to promotions with the Kenosha Police Department" and "when defendants Larsen and Patton chose not to promote Moretti to Sergeant, their acts were deliberate act of discrimination against him based on his sexual orientation." [Dkt. No. 19, ¶¶ 94-95]. As detailed at length above, Larsen's and Patton's actions in the promotion decisions to Sergeant were not constitutional violations, so Plaintiff's *Monell* claim necessarily fails. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (holding there is no municipal liability absent an underlying constitutional violation).

Plaintiff's Complaint does not challenge any express policy of the City's or the Department's causing a constitutional violation. [*See* Dkt. No. 19]. Similarly, Plaintiff's Complaint does not challenge any practice of the City or Department that, when followed for promotion selections to Sergeant, caused constitutional violations. [*See* Dkt. No. 19]. Notwithstanding, there is simply no evidentiary record suggesting any policy or practice with regard to promotion cycles for Sergeant were applied in a discriminatory manner. All candidates followed the same procedures and processes, and all were given an objective score based on the process. [Defs. PFOF ¶¶ 26- 28].

There is no evidentiary record suggesting Larsen or Patton acted outside of the express policies of the City and Department when selection promotions to Sergeant from the 2021 and 2023 Promotion Cycles.

## **CONCLUSION**

Summary judgment is not a dress rehearsal for trial It is the put-up-or-shut-up time at which Plaintiff must show he has enough evidence to warrant a trial. *Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 509 F. Supp. 2d 752, 760 (W.D. Wis. 2007). But Plaintiff has nothing to "put up," making trial unnecessary.

As set forth above, Defendants respectfully request the Court grant their joint motion for summary judgment because there are no disputed material facts, and they are entitled to judgment as a matter of law as to all claims set forth in Plaintiff's Amended Complaint [Dkt. No. 19].

Dated this 9th day of July, 2026.

Respectfully Submitted,

BUELOW VETTER BUIKEMA OLSON
& VLIET, LLC

*/s/ Joel S Aziere*
Joel S. Aziere (WI Bar No. 1030823)
jaziere@buelowvetter.com
Hunter M. Cone (WI Bar No. 1123048)
hcone@buelowvetter.com
Buelow Vetter Buikema Olson & Vliet, LLC
20855 Watertown Road, Suite 200
Waukesha, Wisconsin 53186
Telephone: (262) 364-0250
*Attorneys for Defendants, City of Kenosha, Eric T. Larsen, and Patrick D. Patton*

29