UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**PEP MORETTI,**

**Plaintiff,**

**v.** **Case No. 25-C-464**

**CITY OF KENOSHA,**
**ERIC T. LARSEN, in his individual capacity,**
**and PATRICK D. PATTON, in his individual capacity,**

**Defendants.**

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Pep Moretti brought this action against the City of Kenosha, Wisconsin, former Kenosha Police Chief Eric T. Larsen, and current Chief Patrick D. Patton (collectively, Defendants), alleging that Defendants discriminated against him on the basis of his homosexual orientation by failing to promote him to the rank of sergeant. Plaintiff also claims that the City of Kenosha retaliated against him for filing a complaint with the Wisconsin Equal Rights Division. The court has jurisdiction under 28 U.S.C. § 1331. This matter comes before the court on Defendants' motion for summary judgment. Dkt. No. 56. For the following reasons, Defendants' motion for summary judgment is granted.

## BACKGROUND

Plaintiff is a police officer who has been employed by the Kenosha Police Department (KPD or the Department), an agency of the City of Kenosha (the City), since 2009. Dkt. No. 65 ¶¶ 2–3, 6. Since the beginning of his employment with the Department, the individual defendants have been aware that Plaintiff is homosexual. *Id.* ¶ 4; Dkt. No. 77 ¶ 5. Plaintiff is not the only

homosexual police officer in the Department—several other openly homosexual police officers have worked there and been promoted. Dkt. No. 65 ¶¶ 10, 12–16.

KPD made an effort to ensure that its employees who identified as members of the homosexual community were not subjected to invidious discrimination. KPD maintained an anti-discrimination and anti-retaliation policy, and the City maintained an anti-harassment and anti-retaliation policy. *Id.* ¶ 9. KPD also created an "LGBTQ+ Liaison" position, but the parties dispute how effective this position was. *Id.* ¶ 18; Patton Decl. ¶ 5, Dkt. No. 58 (stating that the LGBTQ+ Liason "serves as a point of contact between KPD and the City's LGBTQ+ community to help ensure community concerns are heard and addressed"); Farchione Dep. 27:17–19, Dkt. No. 59-10 ("I think they like having the title, but they don't want anything to go with it.").

Larsen served as the Chief of Police for KPD from May 1, 2021, to December 31, 2022. Dkt. No. 65 ¶ 7. Patton has served as Chief of Police for KPD since January 1, 2023, and still holds the position. *Id.* ¶ 8. KPD policy gives the Chief of Police complete and total authority over the promotion of detectives, sergeants, and lieutenants, including how to prioritize which ranks are filled and when. *Id.* ¶¶ 26–27; Dkt. No. 77 ¶ 26. The Chief also has the authority to formulate a promotional process, ranking candidates based on a combination of an oral interview, an in-house assessment, seniority, and education. Dkt. No. 65 ¶ 28.

Any qualified employee of KPD may participate in the promotional process set by the Chief. *Id.* ¶ 29. After going through the various components of the promotional process, individuals are placed on an eligibility list and ranked from highest to lowest score. *Id.* ¶ 31. Once an eligibility list is created, it stays in effect for a prescribed period of time, "generally not less than 18 months, with an option to extend the list up to one year at the discretion of the Chief of Police." *Id.* ¶ 35. When making a promotion, the Chief may select only from the top five scoring

candidates on the eligibility list for the position at the time of the vacancy—there are no exceptions. *Id.* ¶¶ 32–33. When an individual is promoted, the remaining individuals on the eligibility list move up one position. *Id.* ¶ 34.

The events leading up to this lawsuit began in 2021, when Plaintiff applied for a promotion during the promotional process that began on September 1, 2021. *Id.* ¶ 25. During that promotional process, which was implemented by Larsen, an internal evaluation accounted for 55% of an individual's base score. *Id.* ¶¶ 38, 40. The internal evaluation was completed by individuals at KPD who had supervisory authority over the candidate. *Id.* ¶ 39. The remaining 45% of an individual's base score came from an oral interview conducted by a panel of three independent individuals from law enforcement agencies around the state. *Id.* ¶¶ 41–42. In addition to the base score, candidates received points for seniority and education level. *Id.* ¶ 43. For educational points, an associate's degree or equivalent credit hours earned an individual one point, a bachelor's degree or equivalent credit hours earned an individual two points, and a master's degree or above earned an individual three points. Dkt. No. 77 ¶ 32. After scores were tallied, officers were ranked on a 2021 eligibility list.

This 2021 eligibility list was in effect from January 1, 2022, through June 30, 2023. *Id.* ¶ 14. On this list, Detective Benjamin Antaramian ranked first for sergeant eligibility and was promoted to sergeant on January 1, 2022. Dkt. No. 65 ¶¶ 44, 46. After his promotion, there were seven third-shift supervisors. *Id.* ¶ 49. Plaintiff ranked second for sergeant eligibility after Detective Antaramian, so Plaintiff moved to first on the list after Detective Antaramian was promoted. *Id.* ¶¶ 45, 47.

In July 2022, Sergeant Lang retired from his position, leaving KPD with six third-shift supervisors. Dkt. No. 77 ¶ 17; Dkt. No. 65 ¶ 51. The position was left vacant for the rest of that

year, during which period Plaintiff was ranked first on the sergeant eligibility list. Dkt. No. 77 ¶ 17. Larsen states that he elected not to fill the position because of the patrol officer shortage, which meant there was no need for additional supervisory positions. He asserts that Plaintiff was a patrol officer and the need for patrol officers outweighed the need for sergeants at the time. *Id.* ¶ 18. The parties do not dispute that KPD was short-staffed on patrol officers at the time of Sergeant Lang's retirement. Dkt. No. 65 ¶ 52. Larsen also states that he never considered making a promotion to sergeant for the remainder of 2022 after Sergeant Lang's retirement, even though sergeants can and often do perform both supervisory and patrol work for the KPD. *Id.* ¶ 55; Dkt. No. 77 ¶ 22.

Following the 2020 Kenosha riots that erupted after the police shooting of Jacob Blake, which had gained national attention during the trial of Kyle Rittenhouse, KPD faced significant community scrutiny and undertook substantial efforts to improve its operations, policies, and procedures. Dkt. No. 65 ¶ 59. Larsen retired from his position as Chief of Police at the end of 2022, and Patton replaced him as Chief of Police beginning January 1, 2023. *Id.* ¶ 57.

Prior to taking office, Patton had attended a series of listening sessions where citizens and community leaders voiced concerns about the need for "better educated officers and higher educated law enforcement supervisors." Patton Dep. at 43:02–07, Dkt. No. 59-7. In his interview for the position of Chief with the Police & Fire Commission, Patton had laid out a plan for improving the promotion process within the Department to emphasize education and make it more equitable. *Id.* at 44:04–09. Upon his appointment as Chief, the Commission conveyed to him that they would be watching to see his plans put into action. *Id.* at 44:10–14.

Early on after taking office, in an effort to comply with what he viewed as a "public directive," Patton announced a new process for assessing applicants for promotion within the

Department. *Id.* at 42:17–48:19. He moved away from what he described as a process that was "too heavily weighted internally, meaning if you knew certain people or you were liked internally, that sometimes got you further." *Id.* at 47:20–23. Under the new procedure, greater emphasis was placed on formal education and outside interviews. *Id.* at 48:02–07. In Patton's view, promoting a supervisor is "one of the most impactful things you can do to a department." *Id.* at 48:09–11.

Consistent with this goal, Patton changed the formula for ranking applicants seeking promotion beginning with the 2023 eligibility list. For example, under the new procedure, the internal evaluation consisted of 50% of an individual's base score and the external oral interview comprised the remaining 50% of the base score. Dkt. No. 65 ¶ 67. Patton also changed the education points system: he awarded an additional two education points to individuals with bachelor's degrees or equivalent college credits, and an additional four education points to individuals with a master's degree or above. *Id.* ¶ 68. Using these criteria, a new 2023 eligibility list was created, and Plaintiff did not rank in the top five. Dkt. No. 77 ¶ 36. Instead, Plaintiff was ranked nearly at the bottom of the 2023 eligibility list, making him ineligible for a promotion from that list. Dkt. No. 65 ¶¶ 79, 84–85.

At the same time that Patton took office, a referendum approving the addition of ten police officer positions to KPD became effective. *Id.* ¶ 60; Patton Decl. ¶ 13. Given training requirements for the new recruits, Patton believed that additional supervisors would not be needed before July 1, 2023. Patton Dep. 26:07–12, 28:12–14. On May 16, 2023, about a month and a half before the 2021 eligibility list was set to expire, Patton selected three officers to be promoted to sergeant, effective July 1, 2023, from the 2023 eligibility list. Dkt. No. 77 ¶ 37. It is disputed whether Chief Patton knew their sexual orientation at the time of their promotions but in fact all

three officers were heterosexual. *Id.* ¶ 38. Ultimately, Plaintiff was never promoted to sergeant from either the 2021 eligibility list or the 2023 eligibility list.

During his time with KPD, Plaintiff also served as a Field Training Officer (FTO), a position he had held since February of 2019. *Id.* ¶ 3. A FTO trains, develops, and assesses new recruits to KPD. *Id.* ¶ 4. To become an FTO, an officer must complete the FTO training course, as created and maintained by KPD. Dkt. No. 65 ¶¶ 96–97. Once the training course is complete, an officer may be placed in the "FTO cadre," and only if they are placed in the cadre will they be assigned recruits to train and considered a FTO. *Id.* ¶¶ 98–100. The FTO cadre is managed by the KPD Training Division. *Id.* ¶ 104. The assignment of FTOs to recruits varies significantly from year to year, and it is not uncommon for an FTO to spend little to no time training recruits in a given year. *Id.* ¶ 106.

Plaintiff filed a discrimination complaint with the Equal Rights Division (ERD) of the Wisconsin Department of Workforce Development on August 9, 2023. *Id.* ¶ 91. In 2023, the year he filed his discrimination complaint, Plaintiff received 62 FTO hours, the fourth most FTO hours among KPD officers. *Id.* ¶ 107. In 2024, Plaintiff received 104 FTO hours, the most among KPD officers that year. *Id.* ¶ 108. In the middle of 2024, however, several changes were made to Plaintiff's FTO assignments, and by 2025, his FTO duties had been further restricted.

Sergeant Brennan became the Training Division Sergeant at the end of July of 2024, and along with Captain Dillhoff, was responsible for assigning FTOs to new recruits. Dkt. No. 77 ¶¶ 67; Dkt. No. 65 ¶¶ 114, 121. The parties dispute whether Sergeant Brennan was specifically aware of the ERD discrimination complaint Plaintiff filed in August 2023, but it is undisputed that Sergeant Brennan knew Plaintiff was involved in a "lawsuit" regarding KPD's failure to promote him. *Id.* ¶ 66. In mid-2024, a recruit needed a new FTO assigned to finish his training because

his prior FTO moved to a different position within KPD. In August of 2024, instead of choosing Plaintiff to finish the recruit's training, Sergeant Brennan assigned the recruit a new FTO to the final step of his training. Dkt. No. 65 ¶¶ 68–71. He did so despite the fact that Plaintiff had trained the recruit at an earlier time and therefore was familiar with the recruit. *Id.* In September of 2024, just one month later, a different recruit came back from military service and had a preassigned FTO—Plaintiff. *Id.* ¶¶ 73, 75. Nonetheless, Sergeant Brennan assigned the recruit a new FTO, stating that he wanted to get the new FTO more exposure. *Id.* ¶¶ 74–75.

In early 2025, Officer Ramer, a recruit, reported to Sergeant Brennan that Plaintiff made comments regarding his frustration with the City and its promotional process. *Id.* ¶¶ 111–12; Dkt. No. 77 ¶ 85. The recruit believed that Plaintiff's comments could impact future recruits. Dkt. No. 65 ¶ 112–113. Sergeant Brennan testified that he also feared that Plaintiff had been showing signs of "FTO burnout." *Id.* ¶ 114; Dkt. No. 77 ¶ 79. For these reasons, and to give new FTOs necessary experience, Sergeant Brennan, after consulting with Captain Dillhoff, decided to give Plaintiff a break from FTO training, but he was not removed from the FTO cadre. Dkt. No. 65 ¶¶ 115–16; Dkt. No. 77 ¶ 79. Defendants also state that "FTO burnout" was a familiar issue within KPD, and that the standard response was to give the individual a temporary break from FTO duties. Dkt. No. 65 ¶¶ 117–19. Plaintiff, on the other hand, states he was never made aware of any complaints against him or asked whether he felt burnt out from FTO training. Dkt. No. 77 ¶¶ 87, 91.

After receiving a right to sue letter from the United States Equal Employment Opportunity Commission, Plaintiff filed the instant lawsuit. Dkt. No. 65 ¶¶ 92–93. In his amended complaint, Plaintiff asserted various claims of employment discrimination and sexual orientation discrimination against Chiefs Larsen and Patton and the City for failing to promote him to the rank of sergeant. Am. Compl. ¶¶ 78–90, Dkt. No. 19. Plaintiff also claimed that the City retaliated

against him for filing a discrimination complaint with the ERD in violation of Title VII. *Id.* As for the retaliation claim, Plaintiff alleged the following adverse actions:

> [N]ot assigning him recruits as a Field Training Officer, not allowing him to train recruits for other FTOs when those FTOs are absent from work, removing him as the FTO for recruits already assigned to him, not selecting him to train and instruct new recruits from the police academy during the recruits' onboarding process, not selecting him for the equipment operator position on the SWAT team, not selecting him to be an Axon body camera instructor, and failing to provide him requested back-up in a potentially dangerous situation.

*Id.* ¶ 73. Finally, Plaintiff asserted a *Monell* claim against the City of Kenosha because of his belief that the Chief of Police deliberately discriminated against him. *Id.* ¶¶ 91–97; *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

In his response to Defendants' motion, Plaintiff significantly narrowed his retaliation claim to the denial of FTO hours. He also abandoned his *Monell* claim against the City. What remains are Plaintiff's claims that (1) Chief Larsen discriminated against him based on his sexual orientation by failing to promote him to sergeant; (2) Chief Patton discriminated against him based on his sexual orientation by failing to promote him to sergeant; and (3) the City retaliated against him for filing a claim with the Wisconsin ERD by denying him FTO hours.

## LEGAL STANDARD

Summary judgment is proper when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (internal quotation marks and

citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322).

## ANALYSIS

Plaintiff has asserted a claim of employment discrimination against the City of Kenosha in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), based on the failure of former Chief Larsen and current Chief Patton to promote him to Sergeant. In addition, Plaintiff has sued both Chief Larsen and Chief Patton under 42 U.S.C. § 1983, claiming that their failure to promote him because of his sexual orientation violated his Fourteenth Amendment right to equal protection of the law. He also claims that the City violated Title VII by retaliating against him for filing a complaint with the Wisconsin Equal Rights Division.

In *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 662 (2020), the United States Supreme Court held that an employer violates Title VII's prohibition of discrimination on the basis of sex when it discriminates against an individual in the terms or conditions of employment on the basis of the individual's sexual orientation. Even earlier, the Seventh Circuit had held that the Equal Protection Clause prohibits state actors from discriminating against individuals on the basis of sexual orientation. *Hughes v. Farris*, 809 F.3d 330, 334 (7th Cir. 2015). Claims of discrimination on the basis of sexual orientation under the Equal Protection Clause are analyzed

in the same way as Title VII claims. *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003). The same standards apply, and the "only difference . . . is who can be named as a defendant in the action." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n.2 (7th Cir. 2006). The court will therefore address first the failure to promote claims against the City, Larsen, and Patton and then the retaliation claim against the City.

The court acknowledges at the outset the difficulty in applying summary judgment methodology to employment discrimination claims. On the one hand, courts assessing summary judgment motions are not to "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Johnson*, 892 F.3d at 893 (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). These requirements are applied "with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility." *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). As the Seventh Circuit recently reaffirmed, "summary judgment is not the time to decide which narrative to believe. The time for weighing competing evidence is trial, and the job is for a jury not a judge." *Pratt v. Wis. Aluminum Foundry*, 183 F.4th 541, 547 (7th Cir. 2026).

At the same time, however, when assessing pretext, which is key in this case, the plaintiff is required to present evidence that the employer's claimed reason for the adverse action was a lie. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Id.* This standard is intended to keep courts from sitting as a "superpersonnel department" second guessing business decisions. *Cunningham v. Austin*, 125 F.4th 783, 789 (7th Cir. 2025).

The latter rule, at least on the surface, may appear to contradict the rule prohibiting judges from making credibility determinations on summary judgment. How can the court determine whether the reason a supervisor provides for an adverse action is a lie without making a credibility determination, weighing the evidence, or deciding whose narrative to believe? It is the rare case in which a plaintiff can conclusively prove his supervisor is lying at summary judgment. But a plaintiff must at least present evidence "suggesting that the employer is dissembling." *O'Leary*, 657 F.3d at 635. To satisfy the burden on summary judgment on the issue of pretext, a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the stated reason "that a reasonable person could find [it] unworthy of credence." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

With these principles in mind, the court turns to the claims before it.

**A. Larsen Failure to Promote**

Plaintiff claims that the City is liable under Title VII and former Chief Larsen is liable under § 1983 for Larsen's failure to promote him to sergeant because of his sexual orientation. At summary judgment, the ultimate question is "whether the evidence as a whole 'would permit a reasonable factfinder to conclude that the plaintiff's . . . sex . . . caused the discharge or other adverse employment action.'" *Brown v. Chi. Transit Auth.*, 179 F.4th 577, 588 (7th Cir. 2026) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The central issue here is causation: whether Plaintiff's sexual orientation caused him not to be promoted. In other words, the question is whether KPD would not have promoted Plaintiff if he was not homosexual "and everything else had remained the same." *Pratt*, 183 F.4th at 551.

To determine causation, courts look to both direct and circumstantial evidence. *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). That is because there is rarely a

smoking gun in discrimination cases. Rather, discrimination cases are often "factually complex and require sifting through ambiguous pieces of evidence." *Ortiz*, 834 F.3d at 765. Therefore, "[a] plaintiff may use circumstantial evidence to prove discrimination through a chain of inferences." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 804 (7th Cir. 2022). Circumstantial evidence that can support an inference of intentional discrimination includes: "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929.

In this case, the parties set their arguments out in different frameworks. Defendants present their arguments under the *McDonell Douglas* framework, which requires a plaintiff to present a prima facie case of discrimination. Defs.' Br. at 5, Dkt. No. 60; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff, on the other hand, takes the approach of showing that "the evidence would permit a reasonable jury to conclude that a statutorily prescribed factor caused the adverse employment action[,]" also known as the holistic approach. Pl.'s Br. at 7, Dkt. No 69. Because Plaintiff has chosen to proceed using the holistic approach, the court will too. Regardless, the court will consider all admissible evidence in reaching its conclusion. *See Ortiz*, 834 F.3d at 766 ("[A]ll evidence belongs in a single pile and must be evaluated as a whole.").

Defendants argue that Plaintiff cannot make a prima facie case of discrimination against former Chief Larsen because he only made one promotion to sergeant from the 2021 eligibility list. Defs.' Br. at 7–8. Larsen promoted Detective Antaramian, who was ranked first on the eligibility list above Plaintiff. *Id.* They also argue that, after Sergeant Lang retired, his position was left vacant because of a shortage of patrol officers. *Id.* at 9–10. In Defendants' view, because

the "City's personnel and staffing needs prevented any additional Sergeant promotions[,]" Plaintiff cannot establish that he was not promoted because of his sexual orientation. *Id.*

Plaintiff, on the other hand, argues that circumstantial evidence suggests that Chief Larsen had a discriminatory motive when he failed to promote him. The circumstantial evidence Plaintiff references includes what Plaintiff calls the Department's "negative attitude toward gays" and Larsen's promotion of heterosexual officers to sergeant from 2019 to 2021. Pl.'s Br. at 8–9. Plaintiff also asserts that the "shortage of patrol officers" was pretext for not promoting Plaintiff to sergeant. That is because Larsen promoted patrol officers to positions other than sergeant, sergeants continued doing patrol work after being promoted, and it was in the Chief's discretion how to prioritize filling positions. *Id.* at 9–11.

Plaintiff first argues that Chief Larsen in particular had a "negative attitude toward gays." Pl.'s Br. at 8. If true, the evidence might fall into the category of "ambiguous or suggestive conduct" that can serve as circumstantial evidence of discrimination. To support this assertion, Plaintiff cites to two instances of conduct: (1) not allowing officers to wear Pride patches on their uniforms; and (2) refusing to post "Happy Pride Month" on the KPD Facebook page. Neither of these actions suggest any animus toward homosexuals.

As for the Pride patches, the LGBTQ+ Liaison Desiree Farchione did state in her deposition that Chief Larsen did not approve the Pride patches, but she also stated that he did not approve any other type of patch for KPD uniforms. Farchione Dep. 20:19–22:05. Indeed, as Farchione said herself, the reason he denied the request was because KPD "just . . . didn't have patches." *Id.* at 21:22. As for refusing to post "Happy Pride Month" on the KPD Facebook page, Farchione requested that the Public Information Officer make the post, but he responded that the Department could not "make any posts that have to do with any affiliation with anything." *Id.* at 22:12–23:07.

Chief Larsen's refusal to allow "Pride" patches does not show animus toward homosexuals. Were the court to conclude otherwise, the ruling would in effect compel all law enforcement agencies to allow Pride patches, as well as the insignia of any other group, simply to avoid subjecting themselves to Title VII or Equal Protection lawsuits. Plaintiff has presented no evidence that this policy was applied unequally to homosexuals. He does point to an Instagram post made for Black History Month, but this was posted after Chief Larsen's tenure. Therefore, the evidence regarding Pride patches and a failure to post for Pride Month is not enough to serve as circumstantial evidence demonstrating discrimination on the part of Chief Larsen.

Plaintiff also states, more generally, that KPD has a "history of hostility toward gays." Pl.'s Br. at 8. Again, if this evidence were true, it might be important circumstantial evidence for the court to consider. *See Pratt*, 183 F.4th at 553 (noting "the importance of assessing workplace culture in discrimination claims by considering discriminatory comments and actions . . ."). But the evidence Plaintiff cites to support this claim relates to the environment at KPD long before Plaintiff's employment, which began in 2009, and long before the courts had held that discrimination on the basis of sexual orientation violates either Title VII or the Equal Protection Clause. Officer Farchione, who started with KPD in 1998, referenced her experience the "second day on the job" and "within [her] first one year to two years" as an officer, stating that "[i]t was very homophobic." Farchione Dep. 8:16–9:15. When asked about the derogatory comments about homosexuals she has heard in the last five to six years, however, Farchione stated she did not hear comments very often and had only heard them "[a] few times." *Id.* at 12:03. As for the two most recent Chiefs, Farchione stated that she never heard them make any comments about homosexuals. *Id.* at 14:04–09. She was also unaware of any exclusionary practices regarding homosexuals within KPD or of any instance where a homosexual officer was treated differently from a

heterosexual officer. *Id.* at 14:10–20. This evidence does not suggest that KPD had a discriminatory workplace culture. Although the court must look at the evidence as a whole, Plaintiff's evidence on this point does not suggest "ambiguous or suggestive comments or conduct" that give rise to an inference of discrimination based on sexual orientation.

Plaintiff next argues that there is evidence that heterosexual officers who were similarly situated were treated more favorably. More specifically, he claims that Larsen's promotion of three heterosexual officers to sergeant is circumstantial evidence of discrimination. Pl.'s Br. at 8–9. To show that similarly situated employees outside the protected class were treated more favorably, a plaintiff must show that the similarly situated employees were "'directly comparable' to the plaintiff 'in all material respects.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Typically, a plaintiff must show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (internal quotation marks and citation omitted).

Plaintiff first cites the promotion of Cory Brennan and Ryan Alles to sergeant from the 2019 eligibility list, both of whom are heterosexual. What Plaintiff fails to show, however, is that he had even applied or was under consideration for a promotion at the time Brennan and Alles were promoted. He does not present any evidence that he, or any officer with the same sexual orientation, was on the 2019 eligibility list at all. It thus follows that Plaintiff has not shown that Brennan or Alles were similarly situated to him.

Plaintiff also claims that the promotion of another heterosexual officer, Benjamin Antaramian, to sergeant from the 2021 eligibility list is circumstantial evidence of discrimination.

But the parties do not dispute that, at the time of his promotion, Antaramian was ranked first on the 2021 eligibility list, above Plaintiff who was ranked second. Dkt. No. 65 ¶¶ 44–45. This is evidence of differentiating circumstances that would distinguish Larsen's treatment of Antaramian and Plaintiff. In short, Plaintiff has not shown that any of the three heterosexual officers who were promoted were comparators to him. As a result, Plaintiff has failed to show that similarly situated individuals outside the protected class were treated more favorably than him.

Lastly, Plaintiff responds to Larsen's claim that he did not promote him because of the patrol officer shortage, arguing that this is a "dishonest employer justification[] for disparate treatment." *Joll*, 953 F.3d at 929. In other words, Plaintiff attempts to produce evidence of pretext. Pretext, as noted above, "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason[s] it has offered to explain the [failure to promote]." *O'Leary*, 657 F.3d at 635. To satisfy this burden, Plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the stated reason "that a reasonable person could find [it] unworthy of credence." *Boumehdi*, 489 F.3d at 792.

Plaintiff claims the shortage of patrol officers is pretext for discriminatory animus because Larsen promoted or moved other patrol officers out of patrol. More specifically, Plaintiff states that Larsen promoted two officers to detective in January of 2022 and three more in June of 2022. Dkt. No. 77 ¶ 19. In April of 2022, Larsen also promoted a patrol officer to Hit and Run Specialty Officer, an office job. Dkt. No. 67 ¶¶ 6–10. Further, unlike detectives, Plaintiff claims that sergeants continue to do patrol work in addition to their supervisory functions, so it would make more sense to make sergeant promotions than detective promotions if Larsen was worried about

patrol shortages. Pl.'s Br. at 9–10. For these reasons, Plaintiff argues that the shortage of patrol officers was a lie.

But Larsen provides sound reasons for promoting officers to detective and not sergeant: there was a high rate of homicides and firearm violence occurring at the time, so patrol officers and detectives were the busiest positions in KPD. Dkt. No. 77 ¶ 18; *see also* Larsen Dep. 20:09–22, Dkt. No. 59-4. He also stated that the operational consequences of being down a detective were very significant given the levels of violence at the time, and that being down a sergeant was less significant. Larsen Dep. 22:02–12. Notably, Larsen testified that, after Sergeant Lang retired, he never considered promoting *anyone* to the rank of sergeant, and he did not do so. Dkt. No. 65 ¶ 55. Plaintiff does not offer evidence to challenge the sincerity of Larsen's belief that an additional sergeant position was not needed at the time, while additional patrol officers and detectives were. At most, Plaintiff's arguments show "faulty reasoning or mistaken judgment on the part of the employer." *Upchurch v. Indiana*, 146 F.4th 579, 587 (7th Cir. 2025). But that is not enough to show pretext. *See Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 747 (7th Cir. 2021) (concluding that employer's budgetary reason for eliminating a position was genuine and not pretextual because the position was truly cancelled and never filled).

In sum, Plaintiff has failed to show the existence of evidence, considered in its totality, to survive summary judgment. A reasonable jury could not conclude that Larsen did not promote Plaintiff because of his sexual orientation. Summary judgment on the equal protection claim against Larsen is therefore appropriate.

**B. Patton Failure to Promote**

Plaintiff next asserts a Title VII claim against the City and an equal protection claim against Chief Patton based on Patton's failure to promote him to sergeant. The claim against Patton is

nearly identical to that against Larsen: Plaintiff argues Patton harbored a negative view toward gays and offered only pretextual reasons for failing to promote him from patrol officer to sergeant. In particular, Plaintiff focuses on the fact that Chief Patton promoted three heterosexual officers from the 2023 eligibility list to the rank of sergeant effective July 1, 2023, even though Plaintiff ranked first on the 2021 eligibility list.

The claim that Patton harbored a negative attitude toward homosexuals fares no better than the similar claim asserted against Larsen. In support of this assertion, Plaintiff repeats his complaint that Patton, like Larsen, refused the request for officers to wear Pride pins on their uniforms and failed to make a post for Pride Month despite making a post about Black History Month on the KPD Instagram. As for the Pride pins, although Patton did decline the request, he also declined requests to wear Black Pride pins, Blue Line pins, and a 2020 Riot pin. Patton Dep. 155:10–157:08, Dkt. No. 59-7. This shows no sort of animus toward homosexuals and instead reflects a uniform policy that was applied equally to all groups. As for the failure to include a post for Pride Month on KPD's social media account, a request that the Department make such a post was never made. Dkt. No. 77 ¶ 10; Farchione Dep. 23:20–24. It is a stretch to claim that a failure to make a post that was never requested suggests a "negative attitude" toward homosexuals.

As for the failure to promote Plaintiff to the rank of sergeant, Defendants assert that Patton did not promote anyone from the 2021 eligibility list, including Plaintiff, for two reasons: (1) ongoing patrol officer shortages; and (2) a desire to implement a new vision for the police department. According to Defendants, the patrol officer shortage which existed during Larsen's tenure as chief continued into 2023, and these shortages would "shelve any Sergeant promotions for at least the first part of the year," when the 2021 eligibility list was applicable. Defs.' Br. at 10. This changed, however, when the newly hired patrol officers completed their training and

additional supervisors were needed. But by that time, Chief Patton had implemented his initiative to place greater emphasis on education and objectivity in the promotional process, which led him to the creation of a 2023 eligibility list. Rather than use the 2021 eligibility list to select his new supervisors, Defendants assert Chief Patton elected to use the 2023 list because it reflected the priorities he had committed to adopt prior to his appointment as Chief. Because Plaintiff did not rank among the top five candidates under the new procedure, he was not eligible for promotion from the 2023 list. *Id.* at 11–12. Plaintiff, on the other hand, asserts that the "patrol officer shortage" is pretext because (1) several patrol officers were promoted to detective using the 2021 eligibility list, and (2) Chief Patton promoted three officers to sergeant the day after the 2021 eligibility list expired even though there was no change in staffing needs.

The claim that the "patrol officer shortage" is pretext because detectives were promoted was addressed above with regard to Larsen. Detectives were needed as well as patrol officers because there was a shortage of those positions; there was no shortage of supervisors. Chief Patton provided similar reasons for not promoting Plaintiff to sergeant, at least at the beginning of 2023: KPD was "coming off of a year with record high . . . homicide rates," so it prioritized patrol officers and detectives who were "doing the work and not [in] supervisory roles." Patton Dep. 148:18–149:02. For this reason, he, too, never considered making a promotion to sergeant at that time. *Id.* at 149:06–08.

Plaintiff's other argument regarding pretext suffers the same outcome. By the time the need for additional supervisors arose, Patton had implemented his new reform of the promotional process which resulted in a new eligibility list. Patton Dep. 26:07–12. It was entirely reasonable that Patton would use the list produced by the promised reforms to select the new supervisors. Plaintiff emphasizes Patton's admission that there were no changes in staffing needs between June

30, 2023, and July 1, 2023, and suggests that this shows he discriminated against Plaintiff based on his sexual orientation. But this ignores the fact that Plaintiff was not even eligible under the new process because he did not place among the top five candidates. Plaintiff admits that the new procedure for creating the eligibility list was fair and not biased against him or homosexuals in general. Dkt. No. 65 ¶ 81. Had he placed among the top five candidates, there is no reason to believe Plaintiff would not have received a promotion, especially given the positive recommendations he had previously received from supervisors, including Patton.

In sum, Plaintiff has offered no evidence from which a reasonable jury could conclude that Patton was motivated by anything other than his commitment to upgrade the supervisory personnel of the Department he headed. Defendants' motion for summary judgment on the claim against the City and Patton will therefore be granted.

**C. Retaliation**

Plaintiff's remaining claim asserts that the City of Kenosha retaliated against him in violation of Title VII after he filed an employment discrimination complaint with the ERD in August of 2023. "Title VII prohibits employers from 'retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice.'" *Pratt*, 183 F.4th at 556 (quoting *Lewis v. Wilkie*, 909 F. 3d 858, 866 (7th Cir. 2018)). As with Title VII discrimination claims, the core question is simple: "could a reasonable trier of fact infer retaliation . . . ?" *Id.* (quoting *Castro v. Devry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)). Making that showing requires evidence of three elements: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Id.* (citing *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023)). The court will focus its analysis on the third element—causation.

A plaintiff can present evidence of "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces" to show causation. *Boumehdi*, 489 F.3d at 792. Most frequently, evidence of a "suspiciously short period of time between the employee's complaint and the adverse employment action" is used to establish causation. *Id.* at 793. "[W]hen there is a long gap between a protected activity and an adverse employment action, a plaintiff cannot support [their] causal connection solely with evidence of 'suspicious timing.'" *Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017). Nonetheless, when there is a causal connection supported by other circumstantial evidence, a long gap in timing will not undermine that evidence of causation. *Id.*

In support of the motion for summary judgment, the City notes that Plaintiff's FTO hours in 2023, the year he filed his complaint, were the fourth highest among KPD officers. In 2024, the year after filing the complaint, his FTO hours were the highest among KPD officers. In the City's view, these numbers "completely defeat" Plaintiff's claim of retaliation. Defs.' Br. at 17. The City also claims that the decision to put Plaintiff on a temporary break from FTO duties was for the following, non-retaliatory reasons: "(1) newly certified FTOs needed opportunities to gain experience and were prioritized for recruit assignments; (2) Plaintiff had trained recruits continuously and with the highest number of hours in the Department for two years; and (3) the Training Division had concerns Plaintiff was experiencing 'FTO burnout.'" *Id.* at 18. The City thus contends that, regardless of whether Plaintiff filed the 2023 ERD complaint, KPD would have taken the same action regarding Plaintiff's FTO hours.

Plaintiff argues in response that within weeks of becoming the Training Division Sergeant, Sergeant Brennan began restricting Plaintiff's FTO hours. He contends that under the Field Training and Evaluation Policy, giving other FTOs more exposure was not a reason to move a

recruit to a different FTO, as occurred here. In Plaintiff's view, "one could infer from the timing and deviations from policy and standard practice that Brennan had a retaliatory motive." Pl.'s Br. at 19. Plaintiff further argues that Sergeant Brennan's reasons for giving him a break from FTO hours are pretextual. Plaintiff states that the negative feedback from recruits was a lie, that there is no evidence he suffered from FTO burnout, and that recruits were placed with non-FTOs before allowing him to serve as a substitute FTO contrary to Department practice. *Id.* at 19–22.

Here, the timing of the alleged retaliation does not support an inference of causation. Plaintiff filed his ERD claim in August 2023 yet had the fourth highest number of FTO hours in that year and the highest number in 2024. It was not until 2025 that Seargent Brennan, in consultation with Captain Dillhoff, decided to temporarily take Plaintiff off the FTO schedule. Although the filing of the ERD complaint occurred before the restriction of Plaintiff's FTO hours, that is the only temporal connection between the two events. "[W]hen so much time passes before the adverse action takes place, the order in which the events occurred does not by itself suggest a causal link between them." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998), *overruled on other grounds by Ortiz*, 834 F.3d 760.

The court therefore turns to the other circumstantial evidence Plaintiff offers to establish causation, namely that Sergeant Brennan's actions were not supported by Department policy or prior practice, and the lack of evidence of negative feedback or FTO burnout. Plaintiff asserts that Sergeant Brennan lied about the negative feedback he received from two recruits regarding Plaintiff's training. Sergeant Brennan stated in his deposition that two different recruits provided negative feedback regarding their training with Plaintiff, Officer Harris and Officer Ramer. Officer Harris denies having provided any negative feedback regarding his training with Plaintiff. Harris Dep. 5:20–7:21, Dkt. No. 59-8. This evidence might support an inference that the criticism

was, in fact, never made and that Sergeant Brennan did not honestly believe recruits had negative experiences with Plaintiff's training. Importantly, however, Plaintiff presents no such evidence with respect to the criticism from Officer Ramer. It is undisputed that Officer Ramer told Sergeant Brennan that Plaintiff had expressed frustrations with the City and a prior promotion cycle. Dkt. No. 77 ¶ 85. Although Officer Ramer stated these comments did not negatively impact his training, he did find the statements "concerning" and thought they could "impact future recruits." Dkt. No. 65 ¶¶ 112–13; Ramer Dep. 29:24–30:21, 38:01–40:25, Dkt. No. 59-5. Therefore, one of the primary reasons for limiting Plaintiff's FTO hours remains unchallenged. *See O'Leary*, 657 F.3d at 635–36 (even though official from one hospital denied making statements critical of plaintiff, fact that official of other hospital confirmed criticism supports employer's stated reason for termination).

Plaintiff also claims there is a lack of evidence that he was experiencing FTO burnout. The decision to give Plaintiff a break from training recruits, however, was also based on the assessment by Sergeant Brennan and Captain Dillhoff of how often he had been training. Sergeant Brennan testified that "it was a combination of the conversation with the recruits in regards to the quality of the training, and then the tempo at which Officer Moretti had been training signified to me and then my captain that Officer Moretti was due for a break from field training duties." Brennan Dep. 8:03–08, Dkt. No. 59-1. Captain Dillhoff confirmed that the primary reason for giving Plaintiff a break was the number of recruits he had been training and the number of FTOs that needed experience training recruits. Dillhoff Dep. 7:05–11, Dkt. No. 59-6.

Plaintiff complains that Sergeant Brennan never told him why he was removed from FTO duties, but Sergeant Brennan explained that he wanted to keep complaints or comments by recruits confidential and also hoped to avoid upsetting Plaintiff. Brennan Dep. 20:12–18, 25:19–22. After

approximately seven or eight months, the break ended and Plaintiff was assigned a new recruit to train. Sergeant Brennan regarded Plaintiff as a good FTO and expressed concern over the possibility of burn-out, as well as the need to provide new FTOs an opportunity to gain training experience. These are the same reasons offered by Captain Dillhoff for giving Plaintiff a break, and neither were acting at the direction of Chief Patton.

In light of this evidence, no reasonable jury could conclude that Sergeant Brennan's reasons for giving Plaintiff a break from FTO duties were lies. Plaintiff has presented no evidence that it was in retaliation for filing a complaint with the ERD. Summary judgment will therefore be granted on this claim as well.

## CONCLUSION

For the above reasons, Defendants' motion for summary judgment (Dkt. No. 56) is **GRANTED**. This case is dismissed. The clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 5th day of November, 2026.

William C. Griesbach
United States District Judge